

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AA/IC/JRS
F. #2023R00212

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 18, 2025

By ECF

The Honorable William F. Kuntz II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. David Mccann
                Criminal Docket No. 23-8 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter in advance of defendant David Mccann's sentencing, which is scheduled for Tuesday, February 25, 2025 at 2:30 p.m. On August 13, 2024, the defendant pled guilty to firearms trafficking conspiracy, in violation of 18 U.S.C. §§ 933(a)(3) and 933(b), as well as conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(vi). For the reasons set forth below, a sentence of 108 months' imprisonment, which is at the top of the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range that was contemplated in the parties' plea agreement, is appropriate here.

      I.    Background

      Mccann organized a large-scale firearms and narcotics trafficking ring that operated in and around the Breukelen Houses, a public housing complex located in the Canarsie neighborhood in Brooklyn, New York. Over the course of the government's investigation, Mccann, his co-defendants and other co-conspirators sold over 50 guns and over 1,000 grams of fentanyl to an undercover law enforcement officer (the "UC").

      The defendants, of course, did not believe they were selling guns to a law enforcement officer. Instead, the UC told the defendants that he was a drug dealer who needed guns and that he was also going to resell some of the guns that were provided to him. See Presentence Investigation Report ("PSR") ¶ 6. Despite this knowledge, Mccann continued to sell large quantities of drugs and guns to the UC without hesitation.

      Mccann first met the UC on January 5, 2022. Id. ¶ 7. Two days later, Mccann and another co-conspirator sold drugs to the UC. Id. After selling drugs to the UC on several additional occasions, Mccann began to sell guns as well. Id. ¶ 8. Mccann also introduced the UC to other

suppliers of guns and drugs, including his co-defendants, Raymond Minaya, Tajhai Jones, and Calvin Tabron, as well as other uncharged co-conspirators. Id. Mccann did not hide the fact that he was a central member of this scheme. In fact, during one transaction where the UC purchased drugs from one of Mccann's co-conspirator, Mccann demanded the UC make him a supplemental payment, in addition to the payment made to the co-conspirator, because, as Mccann explained, "every transaction goes through me."

The guns sold to the UC throughout this scheme originated from numerous sources—some of the guns were already in illegal circulation in Brooklyn and used in violent crimes, while others were trafficked from Virginia to Brooklyn by Mccann's co-defendants, Tabron and Jones. Id. ¶ 10. The investigation revealed that defendant Tabron would often purchase three or four guns at a time from retailers in Virginia, near where Tabron lived, for the express purpose of bringing them to Brooklyn to engage in sales set up by his co-defendants. Id. Many of the guns Mccann sold were handguns that could be easily concealed. Additionally, certain guns sold as part of the conspiracy had defaced serial numbers. Minaya—Mccann's codefendant whom Mccann introduced to the UC—also sold the UC two firearms that were used in prior shootings that resulted in victims sustaining bodily injuries. Id. ¶ 9.

In total, during the course of the gun trafficking conspiracy, Mccann facilitated or sold 55 firearms to the UC. In addition, Mccann and his co-conspirators also conspired to sell more than 1,000 grams of fentanyl, a lethal and addictive synthetic opioid, over 100 grams of cocaine base, and various other narcotics including oxycodone and heroin. PSR ¶ 12.

Mccann and his co-defendants' drug and gun sales took place primarily in vehicles outside of homes in the Breukelen Houses complex. Almost all of the sales occurred in the middle of the afternoon and in broad daylight, with Mccann and his co-conspirators sometimes brazenly walking down public streets carrying bags of dangerous guns. Certain transactions also took place during the summer months at the Canarsie Pier—a popular recreational area where scores of Brooklyn families kayak, picnic, and play with their children at the playground.

Mccann and his co-defendants, including Minaya, were members of the Gorilla Stone Bloods ("Gorilla Stone") gang. Gorilla Stone has many members across New York, including throughout New York City. Gorilla Stone is a highly organized street gang that sells narcotics and commits violence throughout the region. Mccann took photographs of himself with gang insignia, as depicted below, and published a photograph on social media to promote the gang.

2

 

II.    Applicable Law

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

### III. Analysis

#### A. The Parties' Stipulated Guidelines Range

The Guidelines offense level to which the defendant stipulated in the plea agreement is as follows:

Count One: Gun Trafficking Conspiracy:

| | | |
|---|---|---:|
| Base Offense Level (§ 2K2.1(a)(4)) | | 20 |
| Plus: | More than 25 Firearms (§ 2K2.1(b)(1)) | +6 |
| Plus: | Obliterated Serial Number (§ 2K2.1(b)(4)) | +4 |
| Cap: | Offense Level May Not Exceed 29 Based Upon (b)(1) – (b)(4) | 29 |
| Plus: | Trafficking of Firearms (§ 2K2.1(b)(4)) | +4[1] |
| Total: | | 33[2] |

Count Seven: Fentanyl Trafficking Conspiracy:

Base Offense Level (§ 2D1.1(c))                            26[3]

---

[1] The Probation Department's estimate increases two levels, instead of four, for this enhancement. See PSR ¶ 28. As discussed below, the government disagrees.

[2] The Probation Department also included a four-level enhancement because Mccann was an organizer or leader of criminal activity that involved five or more participations, pursuant to U.S.S.G. § 3B1.1(a). See PSR ¶ 30. As discussed below, the government opposes this enhancement.

[3] The Probation Department estimates a base offense level of 30. See PSR ¶ 19.

4

|  |  |  |
|---|---|---|
| Plus: | Firearm Possessed (§ 2D1.1(b)(1)) | +2[4] |
| Total: |  | 28 |

Grouping Analysis:

|  |  |  |
|---|---|---|
|  | Grouping of Closely Related Counts (U.S.S.G. § 3D1.2) |  |
|  | Highest Offense Level of the Counts (U.S.S.G. § 3D1.3) | 33 |
| Less: | Timely Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)-(b)) | -3 |
| Less: | Global Resolution (U.S.S.G. § 5K2.0) | -1 |
| Total: |  | 29 |

### B. The PSR's Guidelines Range

The PSR's Guidelines estimate differs from the range contemplated by the parties in the plea agreement. As discussed below, the government disagrees with: (a) the PSR's inclusion of the leadership enhancement, (b) the PSR's use of the 2024 Guidelines Manual and its gun trafficking enhancement, and (c) the PSR's multiple count analysis. The government agrees that the PSR correctly calculated the base offense level for the drug-related conduct, and that the plea agreement underestimated it.

**Leadership Enhancement.** The PSR adds four levels for Mccann serving as the leader or organizer of the scheme. PSR ¶¶ 30, 36. The government does not believe the enhancement is warranted.

In assessing whether an increase for an organizing or leadership role is appropriate under U.S.S.G. § 3B1.1, the Guidelines call for the consideration of multiple factors including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, Application Note 4. In applying U.S.S.G. § 3B1.1, "[t]he district court's inquiry is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account." United States v. Brinkworth, 68 F.3d 633, 641 (2d Cir. 1995).

In this case, Mccann was certainly an important member and conduit of the scheme. He was involved in most of the transactions, helped introduce the UC to his co-defendants, and insisted that all transactions go through him. See PSR ¶¶ 8-11. That said, he did not exercise

---

[4] The PSR is internally inconsistent as to whether this enhancement applies. It is included in paragraph 19 when describing Count 7, but it is not included in paragraph 32.

control or decision-making authority over his co-defendants. Based on the unique balance of the factors in this case, and consistent with the parties' stipulated Guidelines range, the government submits that the four-level leadership enhancement is not warranted.

<u>Gun Trafficking Enhancement.</u> The PSR also adds two-levels pursuant to an enhancement in the 2024 Guidelines Manual under U.S.S.G § 2K2.1(b)(5). The government disagrees with (a) the use of the 2024 Guidelines Manual, and (b) how this enhancement is applied. Instead, the government submits application of the version of the Guidelines at the time of the offense conduct (<u>i.e.</u> the 2021 Manual) and thus a four-level enhancement for gun trafficking is correct.

Under the 2024 Guidelines Manual, U.S.S.G § 2K2.1(b)(5) governs enhancements for gun trafficking. Under U.S.S.G § 2K2.1(b)(5)(c), five levels are added, if, as is true here, a defendant "transported, transferred, sold, or otherwise disposed of, or purchased or received with intent to transport, transfer, sell, or otherwise dispose of, two or more firearms knowing or having reason to believe that such conduct would result in the receipt of the firearms by an individual who … intended to use or dispose of the firearms unlawfully" or "attempted or conspired to commit [such] conduct." In this case, the UC was posing as a drug dealer who needed guns and who said that he was also going to resell some of the guns that were provided to him. Because it is unlawful to sell firearms to criminal resellers and illegal for drug dealers to possess firearms, the defendant's sales were to someone who "intended to use or dispose of the firearms unlawfully." Thus, five levels would be added.

Under the 2021 Guidelines, however, U.S.S.G § 2K2.1(b)(4) adds four levels if the defendant engaged in the trafficking of firearms. Because application of the 2024 Guidelines would generate a higher Guidelines range than the version of the Guidelines Manual in effect at the time of the offense, the Court should apply the 2021 Guidelines Manual, as contemplated in the parties' plea agreement, to avoid an <u>ex post facto</u> violation. See <u>Peugh v. United States</u>, 133 S. Ct. 2072, 2078 (2013) (holding that "there is an <u>ex post facto</u> violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense").

<u>Grouping of Offenses/Multiple Count Adjustment.</u> The PSR treats the gun and drug trafficking counts to which the defendant pleaded guilty as separate for purposes of conducting a multiple count adjustment analysis. The government disagrees, and submits that Counts One and Seven should be grouped, as contemplated by the parties in the plea agreement. Under U.S.S.G. § 3D1.2(c), counts are grouped if "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." In this case, the PSR adds two levels because the defendant possessed a firearm while selling narcotics. PSR ¶ 19. Accordingly, since the gun conduct is embodied in the enhancement, Counts One and Seven should be grouped, and thus, the offense level is the "the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).

<u>Drug Calculation.</u> The PSR calculates the base offense level for the narcotics sales as level 30. PSR ¶ 33. The government agrees that the PSR correctly calculated the total drug

6

weight attributable to Mccann, and thus that the parties' stipulated Guidelines range in the plea agreement is an underestimate. This undercounting does not change the ultimate Guidelines range, however, because the offense level is determined in this case by looking to the "the highest offense level of the counts in the Group," U.S.S.G. § 3D1.3(a), which is driven here by the gun trafficking conduct in Count One.

### C. A 108-Month Term of Imprisonment is Appropriate

The starting point at sentencing, in this as in every case, is the recommendation of the Sentencing Commission embodied in the Guidelines calculation. "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States, 551 U.S. 338, 348 (2007). However, sentencing courts "may not presume that the Guidelines range is reasonable" because the final assessment must be individualized. Gall, 552 U.S. at 39; see also Rita, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."); cf. id. at 352–55 (explaining why appellate courts—unlike sentencing courts—may presume the reasonableness of Guidelines sentences but may not presume unreasonableness of non-Guidelines sentences).

The sentence that the Court imposes on Mccann should hold him accountable for the grave dangers he posed to others simply to line his pockets and should deter him and others similarly situated from engaging in narcotics and gun trafficking. Mccann's introduction of deadly firearms and lethal narcotics into our community was, as this Court previously recognized, "inherently dangerous." United States v. Mccann, No. 23-CR-08 (WFK), 2023 WL 2857917, at *4 (E.D.N.Y. Apr. 10, 2023). Mccann profited by flooding our community's streets with lethal and easily concealable guns. And he did so outside of a public housing complex that houses over 4,000 men, women, and children and in a public park in the middle of the spring and summer. Worse still, these sales often occurred in broad daylight, further demonstrating Mccann's brazenness in disobeying the law.

The Court's sentence should account for the unique dangerousness of Mccann's criminal conduct given that it took place in the Eastern District of New York. In United States v. Cavera, 550 F.3d 180 (2d Cir. 2008), the Second Circuit affirmed a district court's upward departure[5] on this basis that gun trafficking within the Eastern District of New York threatens the community's safety in specific ways that are not present elsewhere in the country:

---

[5] For the avoidance of doubt, the government does not seek an upward departure in this case, but instead seeks a sentence at the upper end of the Guidelines range.

> [U]rban areas have higher homicide rates than suburban and rural areas; that in those parts of New York City included in the Eastern District of New York, population density sometimes exceeded 35,000 persons per square mile when the national average was only 78 persons per square mile; and that guns smuggled into New York City frequently end up in the hands of persons not legally authorized to possess them and are used for illegitimate purposes . . . From these circumstances, [the district court] concluded that firearm trafficking into New York City, and specifically into those boroughs in the Eastern District of New York, presented a greater risk of harm.

Cavera, 550 F.3d at 195; see also id. at 204 (Raggi, J., concurring) ("guns smuggled into New York City are (1) commonly acquired illegally and (2) then used for unlawful purposes . . . We would only have to look through our own docket history to take judicial notice of the fact that the Eastern District of New York is home to the city's five traditional organized crime families, numerous large-scale narcotics enterprises, and street gangs of all stripes—for all of whom guns are tools of the trade and gun violence a routine form of communication. . . To be sure, if a gunman, in any part of the country, shoots at an intended victim and hits his target, the results are equally tragic. But if the gunman misses his target, the cited statistics plainly support an inference that the risk of injury, if not death, to a nearby person is many times greater in the Eastern District of New York than in most parts of the country."). In imposing sentence, the Court must account for Mccann's disregard for the safety of those who live in the community.

   Mccann further endangered others by selling significant quantities of narcotics. He and his co-conspirators sold more than 1,000 grams of fentanyl, which amounts to thousands of deadly doses. He also conspired to sell over 100 grams of cocaine base. The United States is facing an unprecedented drug overdose crisis that has taken hundreds of thousands of lives, driven primarily by synthetic opioids such as fentanyl. Fentanyl is 30 to 50 times more potent than heroin. According to the National Institutes of Health, in 2023 alone (which is the most recent year with available data), fentanyl or other synthetic opioids were the cause of 81,083 drug overdose deaths in the United States. The defendant is not individually responsible for the magnitude of this crisis, but he is accountable for his choice to help perpetuate it—and the seriousness of the crisis thus warrants commensurately serious punishment. Mccann made the conscious decision to profit from a deadly opioid overdose crisis driven by lethal fentanyl—a miniscule amount of which can be sufficient to kill.

   The defendant argues that he deserves a sentence of 60 months because this is his first criminal conviction. However, the defendant's conduct in this case was not a one-time aberration—rather, he sold guns and fentanyl again and again over the span of six months. Mccann was a proud member of the Gorilla Stone gang, as evidenced by his social media posts. He unflinchingly connected the UC with a web of drug and gun dealers, suggesting that this was not his first time doing so. For those reasons, the defendant's history and characteristics show that a top of the Guidelines sentence of 108 months' incarceration is warranted in this case.

   Accordingly, the Section 3553(a) factors weigh in favor of a sentence to a 108-month term of incarceration, which is at the top of the applicable Guidelines range estimated in the parties' plea agreement.

8

IV.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 108 months' incarceration.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By:      /s/
      Adam Amir
      Irisa Chen
      James R. Simmons
      Assistant U.S. Attorneys
      (718) 254-7000

cc:    Clerk of the Court (WFK)
      United States Probation Officer Nicole Gervase
      Counsel of Record (by ECF)